# Zoë Dolan

www.zoedolan.com
zdolan@gmail.com

Attorney At Law
Admitted NY & CA
(347) 301-5180

PO Box 32044
Los Angeles, CA 90032

September 14, 2018

Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11205
*Via ECF & E-mail*

Re:     *United States v. Sean Price*, 17-cr-301
          Sentencing Submission

Dear Judge Garaufis:

*Sean Price As A Human Being*

Sean Price experienced an event that changed the course of his life when he was fourteen years old. For the preceding six years, he had played first baseman and pitched for his youth league baseball team, and he had also served as lead-off batter. Presentence Report ("PSR") at ¶ 70; *see also* Report of Dr. Richard B. Kreuger, M.D. ("Kreuger Report") (filed separately under seal as Exhibit 1 to my additional letter to Your Honor (the "Under Seal Submission")) at 2. He dreamt of becoming a professional baseball player one day – and he showed promise. *Id.* But it all came crashing down when he was shot in his right arm and survived an injury that rendered him unable to play the game ever again. *Id.*

The backstory is that Sean had become involved with a girl who had told him she was not involved with anyone else, but whose ex-boyfriend flew into a jealous rage when he discovered them together. *Id.* The result was five days in a hospital, the remainder of the school year spent at home, and depression that descended into an addiction to alcohol, marijuana and crack cocaine, and, eventually, heroin and Percocet – a spiral that Sean describes as one in which "[his] life went down the drain." *Id*; PSR at ¶¶ 88-89.

Sean has undergone two out-patient drug recovery programs, however, addiction has remained a lifelong struggle for him. *See* PSR at ¶¶ 88-94. It is this battle that figures centrally – as it so often does in criminal cases – in the prior criminal history. *See* Kreuger Report at

1

11. Nevertheless, to Sean's credit, as Dr. Kreuger's Report indicates, Sean "had made significant efforts in turning his life around prior to his most recent arrest." *Id.*

This progress is borne out in letters to the Court from Sean's mother and two neighbors who have knowledge of the charges and jury verdict. *See* letters attached collectively as Exhibit A. In a similar vein, it bears noting, Sean completed a Metropolitan Detention Center Education Department course in Entrepreneurship in December 2017 only two weeks after his trial – precisely when anyone might otherwise have been most tempted to just give up. Exhibit B. Sean's letter to the Court – showing both his intelligence and potential – is attached as Exhibit C.

*Mitigating Circumstances*

The defense submits that there are three dimensions of mitigating circumstances to consider here. First, the specific nature of this case appears to encompass aberrant behavior on Sean's part.[1] He does not exhibit the nature, characteristics and personal history of a sex offender – let alone a child predator or pornography consumer – and the offense conduct has the feeling of a lapse in judgment, albeit a grave and serious one. *See* Kreuger Report at 11 ("A thorough inventory of Mr. Prices' sexual history discloses no deviancies or hypersexual disorders. Specifically, Mr. Price does not make criteria for pedophilia or ephebophilia (which is a problematic pattern of sexual interest in young teenagers), which requires at least six months of sustained fantasy, urges, or behavior.").

Second, as the evidence at trial established, Jane Doe was a willing participant in this ill-fated love affair. When I think about what happened, I cannot help but consider my own personal experiences; and, although I recognize that society must endeavor to draw age lines somewhere, surely everyone can agree that we each mature in different ways and at different ages. I do know for sure that I would not any man I became physically involved with at age 16 to face criminal consequences. And Jane Doe's attempt at wiping her computer, *see* Trial Transcript at 67 and 561, reads to me as a manifestation of that human reality.

Finally, considering the localized nature of law, it is incumbent upon us to maintain perspective within a broader context of the world at large. Jane Doe's home jurisdiction – a developed and highly civilized one – acknowledges that she was well into the age of consent by the time she and Sean even met online. *See* the Australian Government's "Age of consent laws," available at https://aifs.gov.au/cfca/publications/age-consent-laws (noting that 16 is the age of maturity for sexual consent in New South Wales). The record is consistent with this social determination. *See*, e.g., Trial Transcript at 550-66.

---

[1] Notwithstanding any limitations in U.S.S.G. § 5K2.20, the defense presents this discussion under 18 U.S.C. § 3553(a).

2

*The Guidelines Are Exorbitant*

Even if this case fell within the heartland of problems that the statutes of conviction seem geared toward – that is, _not_ an instance where a young adult's own precociousness figures so prominently[2] in activity so close to the birthday that would have rendered the romance legal under applicable law,[3] as it already was in her own modern home country – the Guidelines range of 360 months remains out of whack. Preliminarily, Congress directed the United States Sentencing Commission to develop sentencing ranges consistent with community sentiment regarding the gravity of the offense and related public concern. 28 U.S.C. § 994(c)(4)-(5).

> Rather than creating punishment levels from whole cloth, however, the Sentencing Commission analyzed the sentences imposed in 10,000 past cases. During this process, the Sentencing Commission did not attempt independently to determine sentences that would accurately reflect community sentiment. Thus, the Commission relied on inputs distant from any meaningful measurement of community sentiment – past or present.

Judge James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 Harv. L. & Pol'y Rev. 173, 185 (2010). As a result, "[t]he Guidelines and congressionally directed ranges are significantly harsher than community sentiment recommends." *Id.* at 195.

> Such findings and conclusions comport with social science in the field. "[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

> Incarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect of increasing incarceration on the crime rate has been essentially zero. Increased incarceration accounted for approximately 6 percent of the reduction in property crime in the 1990s (this could vary statistically from 0 to 12 percent), and accounted for *less than 1 percent* of the decline in property crime this century. Increased incarceration has had no effect on the drop in violent crime in the past 24 years. In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall.

Brennan Center for Justice, *What Caused the Crime Decline?* (Feb. 2015), attached as Exhibit D, at 4.

---

[2] *See*, e.g., Trial Transcript at 550-61.

[3] *Cf.* Government Trial Exhibit 5, and, generally, Trial Transcript Vol. 2.

"Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes." *Id.* at 26 (citing study by the National Academy of Sciences concerning insufficiency of evidence to justify policy assumption that harsher punishments yield measurable deterrent effects). "Sending an offender to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long prison sentences) are unlikely to deter future crimes. Prisons actually may have the opposite effect..." National Institute of Justice:[4] Five Things About Deterrence,[5] attached as Exhibit E. Indeed, "[m]ore severe punishments do not 'chasten' individuals convicted of crimes, and prisons may exacerbate recidivism." *Id.*

### The Government's Objections to the PSR

In typical fashion – at least for this case – the government seeks a "vulnerable victim" enhancement with an untimely, last-minute objection to the PSR. *See* Fed. R. Crim. Pro. 32(f)(1)-(3) (objections due within 14 days of report so that investigation may be furthered accordingly). Weighing against this application are the elaborateness and intensity of Jane Doe's independent efforts to escape from her home situation at all costs, whether by utilizing Sean's help or some other man's. *See* Trial Transcript at 550-66. Given the complexity of her psychological make-up, as further indicated below, expert opinion would be necessary for the defense to formulate a response.

### The Affidavit of Loss

Probation submitted an addendum dated July 24, 2018 (well after the second sentencing date set by the Court) reflecting an "Affidavit of Loss" prepared by Jane Doe's mother. The summary, which lacks detailed itemization and support, includes conjecture without professional basis and overreach such as $40,079 in "[l]oss of earnings" for almost one year while "provid[ing] emotional support" to Jane Doe.[6]

Without going into detail on the public record, suffice it to say that Jane Doe's mental health history preceded any encounter with Sean. *See* Exhibit 2 to Under Seal Submission, at 5 and 8 (indicating prior psychiatric issues, and noting that she "regularly conversed with males in America who were between the ages of 20 to 40 years old" and

---

[4] For more information about the National Institute of Justice, please see http://www.nij.gov/about/Pages/welcome.aspx (last visited October 25, 2016) ("NIJ — the research, development and evaluation agency of the U.S. Department of Justice — is dedicated to improving knowledge and understanding of crime and justice issues through science.")

[5] Available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last visited October 24, 2016).

[6] Whether not working correlates with this case or stems from the mother's mental health history remains an open question. *See* Exhibit 2 to Under Seal Submission, at 9 and 14.

maintained an Instagram account with 40,000 followers). Ascribing a universe of pre-existing intricacies and related characteristics and consequences to Sean – particularly in the absence of independent professional analysis – would be inequitable. In any event, as I argued at trial, the one photograph that exists of Sean and Jane Doe together (Government Trial Exhibit 11J), speaks for itself.

*Conclusion*

As Dr. Kreuger notes, "[Sean's] most significant psychiatric problems are his substance use disorders and successful treatment of these will significantly reduce his risk of recidivism for both sexual and non-sexual crimes." Kreuger Report at 12. In light of the foregoing, the mandatory minimums in this case, coupled with drug treatment, are more than sufficient to serve the punitive and corrective goals of society.

Sincerely,

s/

Zoë Dolan